UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NINA  HUTTEGGER, Personal Representative of the Estate of JUHA-PEKKA  AHOPELTO (Deceased); <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL DAMAGES UNDER THE SUITS IN ADMIRALTY ACT** |

Plaintiff  NINA HUTTEGGER acting as the Personal Representative of the Estate of Juha-Pekka Ahopelto, herewith complains of Defendant UNITED STATES OF AMERICA, and allege as follows:

## **PRELIMINARY ALLEGATIONS**

*(Maritime jurisdiction under SIAA)*

1.      Subject matter jurisdiction lies in this Court under 28 U.S.C. § 1333, Fed.R.Civ.P. 9(h), and the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, as hereinafter more fully appears.

2.      As is hereinafter more fully set forth, this action grows out of the catastrophic fire that killed thirty-four people aboard the dive vessel *CONCEPTION* (O.V.N. 638133) during the early morning hours of September 2, 2019.

3.      The incident which gave rise to this lawsuit is subject to admiralty tort jurisdiction in that: It occurred upon the navigable waters of the Pacific Ocean within the territorial waters of the State of California less than one marine league from the shores of Santa Cruz Island; It had an actual and potential impact on maritime commerce, and; It involved a traditional maritime activity.

*(Parties, Personal Jurisdiction and Venue)*

**Plaintiff and Beneficiaries**

4.    At all material times hereto Plaintiff NINA HUTTEGGER ("Plaintiff HUTTEGGER") was at all times relevant to this Complaint an adult resident of the State of California. Plaintiff HUTTEGGER is the surviving wife of decedent, JUHA-PEKKA AHOPELTO ("DECEDENT AHOPELTO") and the biological mother of Decedent AHOPELTO's minor son C.A., and DECEDENT AHOLPELTO's adult daughter, JULIA AHOPELTO. Plaintiff HUTTEGGER is the Personal Representative of Decedent AHOLPELTO's Estate.

5.    Decedent AHOPELTO was born in 1969. At all times material hereto, he was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. at 215. As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater,* 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

6.    At all times material hereto, Plaintiff JULIA AHOPELTO was at all times relevant to this Complaint an adult resident of the State of California. Plaintiff JULIA AHOPELTO is the surviving daughter of Decedent AHOPELTO.

7.    At all times material hereto, Plaintiff C.A. is the surviving minor son of DECEDENT AHOPELTO.

**The Defendant**

8.    At all times material hereto, the UNITED STATES COAST GUARD (hereinafter "COAST GUARD") was and still is a military, multi-mission, maritime service within the Department of Homeland Security, one of the five armed services of Defendant the UNITED STATES OF AMERICA, and an "agent of the UNITED STATES" within the meaning of 46 U.S.C. § 30904.  As such the UNITED STATES OF AMERICA is designated Defendant herein ("UNITED STATES").

9.    Venue is properly laid in this Court under 28 U.S.C. § 1391(b)(2) in that Defendant's acts and omissions complained of herein occurred within the federal judicial district of this Honorable Court.

## OPERATIVE FACTS

### (*The Small Passenger Vessel CONCEPTION*)

10.   At all times material hereto, Truth Aquatics, a California-organized business, owned by Richard Glen Fritzler and Dana Jeanne Fritzler ("Truth Aquatics" and "the Fritzlers") built, owned, operated, maintained, manned, equipped, controlled, and operated three "small passenger vessels" within the meaning of 46 C.F.R., Subchapter T – *CONCEPTION, VISION*, and *TRUTH*.  Although *VISION* was five feet longer and one foot wider than *CONCEPTION*, they were sisterships in the sense that the layout and general arrangement of their decks, deck houses, and below deck compartments were very similar.

11.   *CONCEPTION* was designed, built, furnished, equipped, inspected, and launched in Long Beach, California in 1981 by the Fritzlers and others, and was redesigned, rebuilt, refurbished, reequipped, relaunched by the Fritzlers and others, in 2005 and/or subsequent years. When C*ONCEPTION* was launched in 1981, she was subject to Coast Guard inspection and certification under 46 C.F.R. § 175.100(a) and was indeed inspected and certificated by the Coast Guard acting for Defendant UNITED STATES by and through a duly authorized Officer in Charge of Marine Inspection ("OCMI").

12.   *CONCEPTION* was likewise subject to Coast Guard inspection and certification at the time of her redesign and reconstruction in 2005 and was indeed reinspected and recertificated at that time by the Coast Guard acting for Defendant UNITED STATES by and through a duly authorized OCMI.

13.   From the time *CONCEPTION* first entered service in 1981 until the date of the catastrophic fire which is the subject of this action, said vessel was further subject to annual inspection and certification under 46 C.F.R. §§ 175.100(a), and

3

185.726, *inter alia,* and was indeed inspected and certificated annually by the Coast Guard acting for Defendant UNITED STATES by and through a duly authorized OCMI.  In addition to said annual inspections, Defendant UNITED STATES also conducted 5-year COI renewal inspections and biannual hull and structural examinations aboard *CONCEPTION* pursuant to 46 C.F.R. § 176.600 *inter alia.*  The OCMI's who inspected and certificated *CONCEPTION* pursuant to those regulations during the years immediately preceding the catastrophe that is the subject of this incident, were members of the Marine Safety Detachment ("MSD") in Santa Barbara, a sub-unit of the MSD for Coast Guard Sector LA/Long Beach.

14.  The Coast Guard developed, adopted, promulgated, published, and updated a T-Boat Inspection Book ("CG-840 TI") which not only prescribes the procedures and protocols for all those inspections, examinations, and certifications but also provides OCMI's with written procedures, protocols, and checklists for such inspections, examinations, and certifications.  The CG-840-T1 and its procedures, protocols, and checklists were last updated in 2011.  In addition to the procedures, protocols, and checklists set forth in the CG-840-TI, the MSD in Santa Barbara prepared, published, adopted, issued, and updated its own supplemental procedures, protocols, and checklists for small-passenger-vessel inspections and examinations like the ones described hereinabove.  The supplemental procedures, protocols, and checklists published by the Santa Barbara MSD were last updated in 2014.

15.  A copy of the Supplemental Procedures Check List referenced herein is attached to the Complaint as Exhibit "A."

16.  Among other things, the procedures, protocols, and checklists described in Paragraphs 107 and 108 hereinabove required the OCMI's to inspect and certificate *CONCEPTION's* wiring and electrical systems to ensure that they complied with the standards set forth in 46 C.F.R. § 183.340.  They also called upon the OCMI's to ensure that small passenger vessels like *CONCEPTION* were equipped with proper fire detection and suppression systems and suitable passenger evacuation hatches and

passages.  Having developed, adopted, promulgated, published, and issued those procedures, protocols, and checklists, the MSD's for Coast Guard Sector LA/Long Beach and sub-unit Santa Barbara and their OMCI's had a manifest duty to comply with said procedures, protocols, and checklists and had no discretion to violate or disregard them.

17.   The Coast Guard, acting by and through its aforesaid MSD's and duly designated OCMI's documented each of the inspections, examinations, and certifications described hereinabove with a dated Certificate of Inspection ("COI"). The MSD in Santa Barbara issued *CONCEPTION* her last COI on or about November 19, 2014, and conducted an annual inspection in 2019, prior to *CONCEPTION* burning to the waterline in the catastrophe that is the subject of this action.  As hereinafter more fully appears, that COI authorized *CONCEPTION* to operate as "a small passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times material hereto, and to carry up to forty-five passengers on overnight voyages along the Southern California coast, even though her electrical wiring and systems, her fire detection and suppression systems, and her passenger-accommodation escape hatch were in open and obvious violation of the procedures, protocols, and checklists described in Paragraph 107 and 108 hereinabove.

18.   Beginning in 2013, the Coast Guard started publishing Navigation and Vessel Inspection Circulars ("NVIC's") and safety alerts about dangers of circuit overloads and shipboard fires caused by the use of power strips and rechargeable devices aboard small passenger vessels.

19.   After the catastrophe that is the subject of this action, the Coast Guard inspected *CONCEPTION's* sistership *VISION*, applying the same procedures, protocols, and checklists the OCMI's of MSD Santa Barbara should have applied to *CONCEPTION*, and discovered numerous glaring deficiencies in *VISION's* wiring and electrical systems, fire detection and suppression systems, and passenger-accommodation escape hatch.

20.  *CONCEPTION*, which is depicted below, was constructed of wood and fiberglass. She had a registered tonnage of 66 net tons and as of September 2, 2019, was licensed by the Coast Guard to carry up to six crew members and one hundred passengers for hire and to conduct overnight, near-coastal voyages upon the territorial, near coastal waters of the Santa Barbara Channel



21.  As designed, built, equipped, redesigned, rebuilt, and refurbished, *CONCEPTION* had three decks.  The pilothouse and sleeping quarters for five of her crew members were located on the vessel's uppermost, or "sun deck," atop the main-deck house, and were accessed from the main deck by a single set of open stairs situated at the after end of the deck house.  Exterior walkways ran along the main deck on either side of the house and provided access to the bow.  The dive station was situated on the main deck's open "fantail" area aft of the house.  The stern of the vessel was equipped with a dive platform that could be raised and lowered and when raised, also functioned as a "skid" or cradle for *CONCEPTION's* fifteen-foot inflatable skiff.

22.  The passenger accommodations were distributed between the main-deck and below-deck areas.  The interior of the main-deck house comprised an open area that was divided into two zones or spaces by low counters and fixed furniture.  The forward one-third of that space housed "the galley" and its electrically powered food-storage and food-preparation equipment.  The after two-thirds of the space comprised

"the salon" where passengers socialized and ate their meals.  A set of fixed counters equipped with food-service platforms, built-in coolers, and an ice maker ran down the centerline of the salon.  Banquette-style seating and a row of padded sofas were built into the port and starboard walls of the salon.  Wooden tables and plastic chairs sat inboard of the banquettes and sofas.  The salon and all of its furnishings were flammable, including the carpeting on the deck and the acoustic tile on the overhead.

23.   The galley/salon space was accessed from the main deck by a doorway at the after end of the deck house which led to and from the dive station and the open fantail.  That entry/exit was equipped with a set of double doors which were always kept open while the vessel lay at anchor.

24.   The main-deck house also embraced three separately enclosed "heads" or toilets. Two of those heads were accessed via flanking doorways on the port and starboard sides of the main deck entry. The third head was located on the starboard side of the deck house and was accessed from an exterior doorway situated at the bottom of the stairway up to the sun deck.

25.   All the passenger accommodations were located below the main deck, within the hull itself, and comprised a bunk room and a shower room separated by a watertight, thwartship bulkhead.  The cramped bunk room was located aft of the shower room and designed to accommodate forty-five passengers and one crew member in a space that was approximately twenty-one feet long and twenty-five feet wide.  Thirteen of the bunks in that compartment were designed for double occupancy and twenty for single occupancy.

26.   Twelve of the double-occupancy bunks were divided into two flights, one above the other, and arranged along each side of the bunk room, six to a side.  Twelve single-occupancy bunks were arranged longitudinally, in the middle of the room, in a block that ran two bunks wide, two bunks long, and three bunks high.  A thwartship block of single-occupancy bunks running three high and two long sat against the after bulkhead.  Viewed from above, the layout resembled a three-pronged fork, where the

outside tangs were double bunks, the center tang was the longitudinal set of double bunks, and the base of the fork was the smaller, thwartship block of singles. The thirteenth double bunk was tucked under the access companionway at the forward end of the bunk room, and the last two single-occupancy bunks were stacked atop one another against the port side of the forward bulkhead. All the bunks were framed in wood and equipped with reading lights, plastic-covered foam mattresses, pillows, and blankets. Privacy was provided by thin wooden partitions and cloth curtains. During the accident voyage, all thirteen of the double bunks and sixteen of the twenty singles were assigned to couples or individuals. The unassigned bunks all lay in the thwartship block that sat against the after bulkhead. The bunk room had no windows, portholes, or skylights. Ventilation was provided by a forced-air system with intakes on the main deck and an air-conditioning system that cooled and recirculated interior air.

27.   Over the years, undocumented and ill-designed modifications were added to the forced-air ducting and compartment overhead. Lighting in the aisles was fluorescent. There were two, residence-grade smoke alarms and one emergency light in the bunk room. Each alarm operated independently of the other, and neither sent a signal to the pilothouse. There was a single, ten-pound, Class ABC fire extinguisher housed at the forward end of the bunk room but no other fire-fighting systems or equipment in that compartment. There were only two means of access to and egress from the bunk room, and neither opened directly onto a weather deck. There was a narrow, curved companionway equipped with stairs that spiraled down to the forward end of the bunk room from the starboard side of the galley. There was also a closed and unmarked, twenty-two-inch-by-twenty-two-inch emergency-escape hatch tucked into the overhead above the aftermost berths in the longitudinal block of single bunks which opened onto a cramped space beneath the aftermost counter in the salon. By virtue of its repeated inspection of *CONCEPTION*, the Coast Guard was aware of these conditions.

28.  The open fantail area at the after end of *CONCEPTION's* main deck was equipped with center-line storage banks for dive equipment such as fins, masks, and SCUBA bottles.  The below-deck space immediately beneath the fantail was divided into two compartments.  The forward compartment housed the "engine room" and abutted the after end of and was separated from the bunk room by a ½-inch thick plywood bulkhead.  That compartment contained the two diesel engines that turned the vessel's twin propellors, two fuel tanks, air compressors for filling the SCUBA bottles, and an auxiliary diesel generator that powered the vessel's electrical system. The after compartment or "lazarette" lay between the engine room and the vessel's transom.  The lazarette housed a nitrox system for producing oxygen-enriched dive air and a storage area for drying wet suits.   Access to and from the engine room and the lazarette was provided through two separate hatches located on the fantail.

29.  As designed, built, equipped, launched, inspected, certificated, redesigned, rebuilt, refurbished, reequipped, reinspected, and recertificated by,  *CONCEPTION* was equipped with an onboard electrical system that was powered by diesel generators.  That electrical system did not fully and/or adequately comply with the standards set forth under 46 CFR 183.340. For example, some electrical items in the bunkroom were not composed of UL Boat or Marine cable called for by such standards, but rather of cheap, everyday Romex wire of the kind one would buy at Home Depot.

30.  The vessel's inadequate electrical system was already stressed by the addition of the nitrox generation system to the point where the galley stove and the nitrox system could not be operated at the same time.   Based on the information the OCMI's gathered in the inspections, examinations, and certifications described hereinabove, the Coast Guard knew, or in the exercise of ordinary care should have known, that Truth Aquatics and the Fritzlers not only added undocumented and ill-designed electrical outlets throughout the vessel for the purpose of battery charging but also permitted and even encouraged passengers like DECEDENT to use

SIAA Complaint of Plaintiff Nina Huttegger
for Wrongful Death and Survival Damages

*CONCEPTIONS's* electrical system to charge digital cameras, video-cameras, smartphones, cell phones, strobe lights, Go Pros, lap top tablets, underwater-scooter power packs, CPAP machines, and other lithium battery-powered electronic equipment

(*The Events Leading Up to the Incident*)



31.   The risk of fire caused or accelerated by the presence of lithium-based batteries is well documented by official studies and mainstream media.  Many types of lithium-battery-powered equipment have long been banned from commercial airliners.  Between 2006 and 2021, the Federal Aviation Administration, an agency of Defendant UNITED STATES, alone recorded 310 air or airport fire incidents involving lithium batteries. The Consumer Product Safety Commission, also an agency of Defendant UNITED STATES, recorded numerous incidents of lithium battery fires during the same period.  More pertinently, on the late afternoon of March 9, 2013, over six years before the fatal fire that is the subject of this action, the *CONDOR EXPRESS*, another "small passenger vessel" within the meaning of 46 C.F.R.§ 175.110(a), caught fire while berthed in Santa Barbara Harbor when the battery charging station for that vessel's portable maritime radio burst into flames

SIAA Complaint of Plaintiff Nina Huttegger
for Wrongful Death and Survival Damages

inside her wheelhouse.

32.   During the pre-dawn hours of October 8, 2018, eleven months before the fatal fire that is the subject of this action, Ken Dehler, an off-duty fireman and a passenger aboard *CONCEPTION*'s sistership *VISION*, heard a "hissing" noise and then a loud "bang" inside that vessel's main deckhouse and discovered sparks, flames, and smoke emanating from two lithium-based batteries that were nested in a charging station plugged into a power strip sitting among paperback books atop a shelf on the starboard side of the *VISION's* salon. After Dehler and another passenger who just happened to be awake smothered the fire with a dry chemical extinguisher from the galley, they unplugged the charger and threw it into a rinse bin located out on the main deck. Dehler and the other passenger promptly reported the fire to the *VISION's* master who reported it in turn to his employers.

33.   On Monday, August 31, 2019, DECEDENT and fellow passengers departed Santa Barbara Harbor aboard *CONCEPTION*, along with *CONCEPTION* crew members, for a three-day voyage through the Channel Islands ("accident voyage"). That voyage would take *CONCEPTION* "between ports in the United States" as that phrase is used in 46 U.S.C. § 30509(a)(1).

34.   On the night of Tuesday, September 1, 2019, while *CONCEPTION* was anchored in Platt's Harbor just a few hundred yards off Santa Cruz Island, some of her passengers made a night dive that concluded some time before 2400.   After that, the vessel buttoned down for the night.   At 0235 hours, the last person awake, *CONCEPTION's* Second Cook Michael Kohls, finished cleaning the salon, galley, and heads and went up to his bunk on the sun deck.   There was no indication at that time of any fire or disturbance in the bunk room, on the fantail, in the salon, in the galley, or anywhere else aboard the vessel.   By the time Kohls nodded off in his berth, everyone aboard *CONCEPTION,* including all six of her crew members, was sound asleep.

35.   Sometime around 0300, Kohls and his fellow crew member, First Cook

SIAA Complaint of Plaintiff Nina Huttegger
for Wrongful Death and Survival Damages

Ryan Sims, were awakened by loud noises and the cry of someone in distress. Earlier that evening, Sims had seen sparks when he plugged his cell phone into one of the charging stations in the salon. Kohls got up to investigate, but when he reached the top of the stairway from the sun deck down to the main deck, he saw flames licking at the stairs from the after, starboard corner of the passenger accommodation. What Kohls saw was a lithium-fueled fire that had been sparked and/or critically accelerated by defective equipment which was plugged into an overburdened shipboard electrical system. This overburdened shipboard electrical system had been designed, developed, built, installed, and refurbished without adequate fire detection, without adequate fire protection and/or without adequate electrical systems and wiring by the Fritzlers, Truth Aquatics, and others, and inspected and approved by the Coast Guard and Defendant the UNITED STATES. Nevertheless, at all times material, the Coast Guard failed to perform adequate inspections, allowing CONCEPTION to sail with these hazardous and ultimately deadly conditions.

36. Lithium-fueled fires are subject to the well-known phenomenon of "thermal runaway" and can quickly generate temperatures in excess of 1000 degrees Fahrenheit. As soon as Kohls saw the fire licking at the bottom of the after stairway, he ran forward along the sun deck and alerted Capt. Jerry Boylan and the rest of the crew. After Boylan made a MAYDAY call at 0314 from *CONCEPTION's* pilothouse, he, Kohls, Sims, First Mate Cullen Molitor, and Deck Hand Milton French realized that the fire had accelerated beyond their control and abandoned ship, taking *CONCEPTION's* fifteen-foot inflatable skiff with them. Apart from passenger Berenice Felipe -- whom Kohls had apparently heard cry out as she pushed open the escape directly above her bunk and fled overboard through the fire – everyone else aboard *CONCEPTION* was trapped down below in the bunk room where they died from the combined effects of fire and asphyxiation after trying to fight the blaze with the fire extinguisher in the cabin.

SIAA Complaint of Plaintiff Nina Huttegger
for Wrongful Death and Survival Damages



## **FIRST CAUSE OF ACTION**

*(Wrongful Death against Defendant UNITED STATES OF AMERICA)*

37.   Plaintiff hereby refers to, and incorporate as though fully set forth herein, each and every allegation set forth in each paragraph hereinabove.

38.   This cause of action arises under the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, and the General Maritime Law of the United States as handed down in *Moragne v. States Marine Lines, Inc*., 398 U.S. 375 (1970), *Sea-Land Services v. Gaudet*, 414 U.S. 573 (1974), *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), and *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996),*inter alia*.

39.   Defendant UNITED STATES would, if a private person, be liable to the Plaintiff and DECEDENT's heirs-at-law in that the Coast Guard and its duly designated OMCI's acted negligently and carelessly at all times material hereto by:

        a.   Abusing their discretion pursuant to Title 46 of the Code of Federal Regulations, Subchapter T, Parts 175 to 187 - governing the inspection and operation of small passenger vessels (less than 100 gross tons) carrying between 6 and 150 passengers overnight;

b.    Ignoring, disregarding, and failing to abide by the procedures, protocols, and checklists set forth in the CG-840-T1 and the supplemental publications issued by the MSD; and

c.    Certificating and authorizing *CONCEPTION* to operate as "a small passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times material hereto, and to carry up to forty-five passengers on overnight voyages along the Southern California coast, even though her electrical wiring and systems, her fire detection and suppression systems, her passenger-accommodation escape hatch, her watch logs and training logs were in open and obvious violation of those procedures, protocols, and checklists.

40.  As a direct, proximate, and legal result of the hereinabove delicts of Defendant, and each of them, DECEDENT died as a consequence of the fire, due to a combination of burns, smoke inhalation, and asphyxiation.

41.  As a direct, proximate, and legal result of the death of DECEDENT, Plaintiff, DECEDENT'S ESTATE, and DECEDENT'S heirs and beneficiaries, have suffered and will continue to suffer the permanent loss of said DECEDENT's services, support, nurture, counsel, and example all to their pecuniary damage in an amount to be proven at the time of trial.

42.  As a direct, proximate, and legal result of the death of DECEDENT, and each of them, Plaintiff, DECEDENT's Estate, and DECEDENT'sS heirs and beneficiaries, have suffered and will continue to suffer the permanent loss of said DECEDENT'S love, society, affection, care, comfort and consortium, all to their non-pecuniary damage in an amount to be proven at the time of trial.

WHEREFORE, Plaintiff prays judgment against Defendant UNITED STATES as is hereinafter set forth.

///

## SECOND CAUSE OF ACTION
(Survival Action)

43.  Plaintiff herewith refers to and by that reference incorporates, as though fully set forth herein, each and every allegation set forth hereinabove.

44.  On or about September 2, 2019, before the foregoing cause of action arose in DECEDENT's favor, DECEDENT, who would have been plaintiff in this action had he lived, died of smoke inhalation, burns, and asphyxiation secondary to the fire.

45.  As a direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT's Estate incurred expenses for funeral and cremation, all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

46.  As a further direct, proximate, and legal result of the hereinabove alleged delicts of the Defendant, DECEDENT was placed in great fear for his life and own physical well-being and consciously suffered extreme, severe, and relentless mental and emotional anguish, terror, and physical pain, and continued to suffer such terror, pain, and anguish for a substantial period of time until he died by fire and asphyxiation while trapped in CONCEPTION's chaotic and over-crowded bunk room, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial herein.

47.  DECEDENT AHOPELTO had a statistical life expectancy of another thirty-four years at the time of his death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendants and each of them, Decedent AHOPELTO has incurred and will continue to incur a loss of future earnings and income, all to his successors-in-interest pecuniary damage in an amount to be determined at the time of trial.

48.  WHEREFORE Plaintiff prays judgment against Defendant the UNITED STATES OF AMERICA as follows:

49.  Funeral expenses in accordance with the allegations set forth above;

50.  Pecuniary and nonpecuniary survival damages, including DECEDENT'S pre-death pain and suffering, in accordance with the allegations set forth above;

51.  Pecuniary and nonpecuniary wrongful death damages, in accordance with the allegations set forth above;

52.  For prejudgment interest;

53.  For the costs of suit herein; and,

54.  For such other and further relief as the Court may deem just and proper.


DATED: September 1, 2021.


NELSON & FRAENKEL, LLP

*/s/Carlos F. Llinás Negret*
Gretchen M. Nelson
Carlos F. Llinás Negret
601 South Figueroa Street, Suite 2050
Los Angeles, CA 90017
844-622-6469
cllinas@nflawfirm.com

KREINDLER & KREINDLER LLP
485 Lexington Ave.
New York, NY 10017

Daniel O. Rose (pro hac vice application to be submitted)
Kevin J. Mahoney (pro hac vice application to be submitted)

*Counsel for Nina Huttegger, Julia Ahopelto, and C.A. (a minor)*

SIAA Complaint of Plaintiff Nina Huttegger
for Wrongful Death and Survival Damages